IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JUDITH CONNER,                               )
                                             )
                    Plaintiff,               )          Civil Action No. 08-cv-1086
        v.                                   )
                                             )
                                             )
COMMISSIONER OF                              )
SOCIAL SECURITY                              )
                                             )
                    Defendant.               )

<u>MEMORANDUM OPINION</u>

CONTI, District Judge

### *Introduction*

This is an appeal from the final decision of the Commissioner of Social Security ("Commissioner or "defendant") denying the claim of Judith Conner ("plaintiff") for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381-83f. Plaintiff contends that the decision of the administrative law judge (the "ALJ") that she is not disabled, and therefore not entitled to benefits, should be reversed or at least remanded for reconsideration because the decision is not supported by substantial evidence. Defendant asserts that the decision of the ALJ is supported by substantial evidence. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The court will deny plaintiff's and defendant's motions for summary judgment and the case will be remanded for further proceedings consistent with this opinion.

*Procedural History*

Plaintiff filed the application at issue in this appeal on a protective basis on March 23, 2005,

asserting a disability since March 23, 2005 due to hepatitis C[1], emphysema[2] and Ménière's disease[3].

(R. at 62-63, 85, 108.)  On November 3, 2005, plaintiff's claim was initially denied.  (R. at 38-42.)

A timely written request for a hearing before the ALJ was filed by plaintiff, and the hearing was

scheduled for June 21, 2007. (R. at 22-27.) Plaintiff appeared with counsel and testified at the

hearing before the ALJ.  (R. at 622-56.)  A vocational expert (the "VE") also testified.  (R. at 645-

55.)  In a decision dated August 10, 2007,  the ALJ determined that plaintiff was not under a

disability within the meaning of the SSA.  (R. at 15-20.)  The ALJ determined plaintiff had severe

impairments; however, plaintiff had the residual functional capacity ("RFC") to perform unskilled

_____

[1]"Hepatitis C is an infection caused by a virus that attacks the liver and leads to inflammation.
Most people infected with the hepatitis C virus (HCV) have no symptoms. . . . [M]ost people don't know
they have the hepatitis C infection until liver damage shows up, decades later, during routine medical
tests.  Hepatitis C is one of several hepatitis viruses and is generally considered to be among the most
serious . . . Hepatitis C is passed through contact with contaminated blood - most commonly through
needles shared during illegal drug use."   http://www.mayoclinic.com/health/hepatitis-c/DS00097 (last
visited Sept. 21, 2009).  Symptoms occurring at the later stages include fatigue, fever, nausea, poor
appetite, muscle and joint pains and tenderness in the area of the liver.  *Id.*

[2]"Emphysema is a factor in the progression of chronic obstructive pulmonary disease (COPD), a
condition that limits the flow of air when you breathe out. Emphysema occurs when the air sacs at the
ends of your smallest air passages (bronchioles) are gradually destroyed.  Smoking is the leading cause of
emphysema."  http://www.mayoclinic.com/health/emphysema/DS00296 (last visited Sept. 21, 2009).
Symptoms include shortness of breath, wheezing, chest tightness, reduced capacity for physical
activity, chronic coughing, loss of appetite and weight and fatigue.  *Id.*  Symptoms are mild at the
onset of the disease and worsen as the disease progresses.  Symptoms include recurring episodes of
vertigo, hearing loss, tinnitus and aural fullness.  *Id.*

[3]"Meniere's disease is a disorder of the inner ear that causes abnormal sensory perceptions,
including a sensation of a spinning motion (vertigo), hearing loss usually in one ear, fullness or pressure
in the same ear, and ringing in the same ear (tinnitus)."
http://www.mayoclinic.com/health/menieres-disease/DS00535 (last visited Sept. 21, 2009).  Symptoms
include recurring episodes of vertigo, hearing loss, tinnitus and aural fullness.  *Id.*

sedentary work.  (R. at 18-19.)  Plaintiff filed a request to review the ALJ's decision, which was denied by the Appeals Council on June 28, 2008, (R. at 4-9.)  Plaintiff timely filed this present action seeking judicial review.

### *Plaintiff's Background, Medical Evidence and Testimony*

#### *Background*

At the time of the hearing before the ALJ, plaintiff was forty-five years old.  (R. at 627.) She completed high school and approximately one year of college, where she studied speech pathology and audiology.  (*Id.*)  Plaintiff was single and received child support from a former spouse.  (R. at 628.)  She had five children with three remaining at home.  (*Id.*)  Plaintiff received medical assistance and food stamps.  (*Id.*)  She last worked part time for a couple of months as a cook waitress and cleaner.  (R. at 628-29.)  Plaintiff reported that she stopped this employment because she called off a lot due to her inability to do the work and her employer needed someone more dependable.  (R. at 629.)  Previously, plaintiff worked part time for one month as a waitress and counter clerk.  (*Id.*)  She reported that she stopped this employment due to hospitalization after about a week and her employer needed someone more dependable.  Plaintiff worked at Clarion College in food service and prep for four years.  (R. at 629-30.)  She left this employment in May 2005, on medical leave due to frequent sickness, hospitalization and dealing with the death of her sister.  (R.. at 630-31.)  In the ten-year period before 2001 plaintiff stayed at home with her children and did not work outside of the home.  (R. at 631.)

***Medical History***

   ***Dr. Ronald Cramer***

   Plaintiff was first seen by Ronald P. Cramer, D.O., on April 12, 2001, due to feeling increasing fatigue. (R. at 267.) Dr. Cramer noted that plaintiff was suspected of having hepatitis C and had a history of IV drug use and alcohol abuse occurring around 1977. (*Id*.) Plaintiff stated complaints of occasional heartburn and asthma. (*Id*.) Dr. Cramer noted that plaintiff reported she was quite depressed and his concern that she should have her depression aggressively treated if he considered her a candidate for interferon[4] treatment for hepatitis C. (R. at 268.) On May 10, 2001, Dr. Cramer noted that plaintiff was positive for hepatitis C. (R. at 264.) On February 5, 2002, plaintiff complained that she was having problems with fatigue, but she felt better when she got extra sleep. (R. at 253.) On March 5, 2002, Dr. Cramer noted that plaintiff was doing well and his only concern was the amount of Xanax[5] she was taking and he recommended that she take less. (R. at 252.) On March 12, 2002, plaintiff stated that she felt dizzy and fatigued and Dr. Cramer noted that she had an unsteady walk. (R. at 248.)

_____

   [4]"Interferon Alfacon-1 is used for: [t]reating long-term hepatitis C virus infection in patients 18 years of age or older." http://www.drugs.com/cdi/interferon-alfacon-1.html (last visited 9/22/09). Side effects include: diarrhea; dizziness; flu-like symptoms (eg, chills; headache; mild, temporary fever); hair thinning; increased sweating; joint or muscle aches; loss of appetite; mild bruising, itching, lump, redness, or swelling at the injection site; nausea; stomach upset; tiredness; and weight loss. *Id*.

   [5]"Xanax is in a group of drugs called benzodiazepines (ben-zoe-dye-AZE-eh-peens). It affects chemicals in the brain that may become unbalanced and cause anxiety. Xanax is used to treat anxiety disorders, panic disorders, and anxiety caused by depression." http://www.drugs.com/xanax.html (last visited 9/21/09). Side effects include allergic reaction (hives; difficulty breathing; swelling of your face, lips, tongue, or throat). *Id*. Other serious side effects include: unusual risk-taking behavior, decreased inhibitions, no fear of danger; depressed mood, thoughts of suicide or hurting yourself; hyperactivity, agitation, hostility, hallucinations; feeling light-headed, fainting; seizure (convulsions); urinating less than usual or not at all; muscle twitching, tremor; or jaundice (yellowing of the skin or eyes). *Id*.

On April 2, 2002 Dr. Cramer reported that plaintiff presented with bilateral wheezing, coughing, and joint aches.  (R. at 247.)  Dr. Cramer noted that plaintiff's biopsy demonstrated essentially no fibrosis despite many years of hepatitis C and alcohol ingestion making it extremely unlikely that she will progress to cirrhosis.  Dr. Cramer concluded that plaintiff did not need Interferon therapy.  (*Id.*)  On February 4, 2003, Dr. Cramer noted that plaintiff had a recurrence of her hepatitis C and noted that her primary problem was fatigue.  (R. at 244.)  Plaintiff was seen by Dr. Cramer on December 2, 2003, for complaints of nausea and epigastric discomfort.  (R. at 242.)  Dr. Cramer noted that plaintiff has a history of Barrett's esophagus[6], hepatitis C that failed Interferon Rebetol[7] therapy for depression and malaise and episodes of pneumonia.  (*Id.*) Dr. Cramer scheduled plaintiff for an endoscopy.  (*Id.*)

Dr. Cramer reported on November 8, 2006, that plaintiff was admitted to the emergency room after having a piece of meat lodged in her throat.  (R. at 578.)  Dr. Cramer noted that plaintiff

---

[6]"Barrett's esophagus is a condition in which the color and composition of the cells lining your lower esophagus change, usually because of repeated exposure to stomach acid.  Barrett's esophagus is most often diagnosed in people who have long-term gastroesophageal reflux disease (GERD) — a chronic regurgitation of acid from the stomach into the lower esophagus. Only a small percentage of people with GERD will develop Barrett's esophagus."
http://www.mayoclinic.com/health/barretts-esophagus/HQ00312 (last visited 9/21/09).  Symptoms include frequent hearburn, difficulty swallowing food, chest pain, black tarry stools and vomiting blood. *Id*.

[7] "Rebetol is an antiviral medication.  Rebetol must be used together with an interferon alfa product (such as Peg-Intron or Intron A) to treat chronic hepatitis C."  Side effects include: allergic reaction (hives; difficulty breathing; swelling of your face, lips, tongue, or throat). Other serious side effects include: pale or yellowed skin, dark colored urine, easy bruising or bleeding, confusion, or unusual weakness; severe depression, hallucinations, thoughts of suicide or hurting yourself; fever, chills, body aches, flu symptoms, trouble breathing; severe blistering, peeling, and red skin rash; blood diarrhea, or black tarry stools; chest pain or heavy feeling, pain spreading to the arm or shoulder, nausea, sweating, general ill feeling; or severe pain in your upper stomach spreading to your back, nausea, vomiting, and fast heart rate.
http://www.drugs.com/rebetol.html (last visited 9/16/09).

continued to have solid food dysphagia[8].  (*Id.*)  On November 20, 2006, plaintiff underwent a upper

endoscopy which revealed a stricture formation of the distal esophagus associated with ulceration

and hiatal hernia.  (R. at 468.)

### Dr. Catherine Cunningham

Plaintiff was admitted on September 13, 2003, to Clarion Hospital due to shortness of breath

and productive cough as well as shortness of breath on exertion. (R. at 123.)  A chest x-ray was

negative, other than chronic obstructive pulmonary disease (COPD)[9].  (*Id.*)  Catherine Cunningham,

D.O., diagnosed plaintiff with bronchitis, COPD, and hepatitis C.  (*Id.*)  On April 13, 2004, plaintiff

complained to Dr. Cunningham of being very tired.  (R. at 146.)  On September 18, 2004, Dr.

Cunningham reported that plaintiff had a lower respiratory infection.  (R. at 135.)  A chest x-ray

indicated that plaintiff had COPD, although there was no signs of cardiopulmonary variation.  (R.

at 136.)  On December 20, 2004, plaintiff saw Dr. Cunningham and complained about pain in her

shoulder and arm extending to her hip.  (R. at 131.)  Dr. Cunningham diagnosed plaintiff with

asthma, depression, anxiety and reflux.  (R. at 132.)

---

[8] "Difficulty swallowing (dysphagia) may mean it takes more time and effort to move food or liquid from your mouth to your stomach. Difficulty swallowing may also be associated with pain. In some cases, you may not be able to swallow." http://www.mayoclinic.com/health/difficulty-swallowing/DS00523 (last visited 9/21/09).  Symptoms include pain while swallowing (odynophagia), not being able to swallow, choking or coughing while eating, sensation of food getting stuck in your throat, chest or behind the breastbone (sternum), frequent heartburn, food or stomach acid backing up into the throat, unexpected weight loss, recurrent pneumonia, and coughing or gagging when swallowing.  *Id*.

[9] "Chronic obstructive pulmonary disease (COPD) refers to a group of lung diseases that block airflow and make it increasingly difficult for you to breathe.  Emphysema and chronic bronchitis are the two main conditions that make up COPD, but COPD can also refer to damage caused by chronic asthmatic bronchitis. In all cases, damage to your airways eventually interferes with the exchange of oxygen and carbon dioxide in your lungs."  http://www.mayoclinic.com/health/copd/DS00916 (last visited 9/16/09).

On February 24, 2005, plaintiff was discharged from Clarion Hospital under Dr. Cunningham's care. (R. at 425.) Dr. Cunningham reported that plaintiff was complaining of shortness of breath and dizziness for two weeks and had cold and flu like symptoms. (*Id.*) Plaintiff also complained of having vertigo with left ear congestion. (*Id.*) Plaintiff was prescribed Rocephin[10], Zithromax[11], Tamiflu and nebulizer treatments of Xopenex[12]. (*Id.*)

On July 25, 2005, Dr Cunningham filled out a medical source statement of plaintiff's work-related abilities. (R. at 281-82.) Dr. Cunningham checked boxes indicating that plaintiff could not lift and carry more than ten pounds due to back pain, could not stand and walk more than one hour

---

[10]"Rocephin is in a group of drugs called cephalosporin (SEF a low spor in) antibiotics. It works by fighting bacteria in your body. Rocephin is used to treat many kinds of bacterial infections, including severe or life-threatening forms such as meningitis." http://www.drugs.com/rocephin.html (last visited 9/16/09). Side effects include: allergic reaction(hives; difficulty breathing; swelling of your face, lips, tongue, or throat). *Id.* Other serious side effects include: diarrhea that is watery or bloody; fever or chills; skin rash, bruising, severe tingling, numbness, pain, muscle weakness; blistering, peeling, and red skin rash; white patches or sores inside your mouth or on your lips; pale or yellowed skin, dark colored urine, confusion or weakness; urinating less than usual or not at all; swelling, pain, or irritation where the injection was given; or chalky-colored stools, stomach pain just after eating a meal, nausea, heartburn, bloating, and severe upper stomach pain that may spread to your back. *Id.*

[11]"Zithromax is an macrolide antibiotic related to erythromycin.It fights bacteria in the body. Zithromax is used to treat many different types of infections caused by bacteria, such as respiratory infections, skin infections, ear infections, and sexually transmitted diseases." http://www.drugs.com/zithromax.html (last visited 9/16/09). Side effects include allergic reaction: (hives; difficulty breathing; swelling of your face, lips, tongue, or throat). *Id.* Other serious side effects include: diarrhea that is watery or bloody; chest pain, uneven heartbeats; nausea, stomach pain, low fever, loss of appetite, dark urine, clay-colored stools, jaundice (yellowing of the skin or eyes); or fever, sore throat, and headache with a severe blistering, peeling, and red skin rash. *Id.*

[12]"Xopenex is a bronchodilator. It works by relaxing muscles in the airways to improve breathing. Xopenex is used to treat reversible obstructive airway conditions such as asthma, bronchitis, and emphysema." respiratory symptoms (shortness of breath, wheezing); or chest pain or irregular heartbeats. http://www.drugs.com/xopenex.html (last visited 9/16/09). Side effects include allergic reaction (difficulty breathing; closing of your throat; swelling of your lips, tongue, or face; or hives. *Id.* Other serious side effects include: worsening of respiratory symptoms (shortness of breath, weezing); chest pain or irregular heartbeats. *Id.*

due to poor respiratory function, was unable to sit for long periods, was unable to handle food due to her hepatitis C and had environmental restrictions due to her exacerbated asthma.  (*Id*.)

Dr. Cunningham filled out a function capacity evaluation form on July 18, 2006.  (R. at 129-30.)  Dr. Cunningham assessed plaintiff to be able only occasionally to lift and carry up to twenty-five to thirty-four pounds, stand for six hours with rest, walk for three hours with rest and totally to avoid exposure to dust, fumes and gases.  (*Id*.)  Dr. Cunningham stated that this was due to plaintiff's hepatitis C and severe asthma that cause significant fatigue.  (*Id*.)  Dr. Cunningham opined that plaintiff could not return to her former job, although she could work part time for four hours per day.  (R. at 130.)

On July 17, 2007, Dr. Cunningham filled out a residual functional capacity questionnaire.  (R. at 605-13.)  In the questionnaire Dr. Cunningham noted that plaintiff had shortness of breath, chest tightness, wheezing, episodic acute asthma, episodic acute bronchitis, episodic pneumonia, fatigue and coughing.  (*Id*.)  Dr. Cunningham marked that plaintiff's symptoms would frequently interfere where her ability to perform simple work tasks.  (R. at 606.)  Dr. Cunningham marked that plaintiff could sit for four hours and stand or walk for two hours.  (*Id*.)  Dr. Cunningham noted that plaintiff would only rarely need to take unscheduled breaks during an eight-hour work shift.  (*Id*.) It was marked that plaintiff would need to avoid from moderate to all exposure of environmental irritants.  (R. at 606-08.)  Dr. Cunningham noted that plaintiff has Ménière's disease and had attacks of balance disturbance, tinnitus and progressive hearing loss, although she never treated plaintiff for Ménière's disease.  (R. at 611.)

***Emergency Room Visits***

On May 24, 2005, plaintiff presented to Clarion Hospital emergency room for complaints of

8

myalgias[13], a cough with chills and a low grade fever.  (R. at 379.)  Ronni Needhan, D.O., reported

that plaintiff's chest x-ray displayed COPD with no acute changes.  (*Id*.)  Plaintiff was admitted and

treated with doxycycline[14] and discharged in stable condition on May 26, 2005.  (*Id*.)  On January

31, 2006, plaintiff was admitted to Clarion Hospital emergency room under the care of Dr.

Cunningham for shortness of breath and coughing spells where she could not catch her breath.  (R.

at 494.)  Plaintiff was treated with intravenous antibiotics, intravenous Solu-Medrol[15] and neblulizer

---

[13]Myalgias refers to pain in a muscle; or pain in multiple muscles. "There are many specific causes of various types of myalgia. Myalgia can be temporary or chronic. Myalgia can be a result of a mild conditions, such as a virus infection, or from a more serious illness." http://www.medterms.com/script/main/art.asp?articlekey=12008 (last visited 9/21/2009).

[14] "Doxycycline is a tetracycline antibiotic. It works by slowing the growth of bacteria in the body.  Doxycycline is used to treat many different bacterial infections, such as urinary tract infections, acne, gonorrhea, and chlamydia, periodontitis (gum disease), and others. Doxycycline is also used to treat blemishes, bumps, and acne-like lesions caused by rosacea. It will not treat facial redness caused by rosacea. Doxycycline may be used in combination with other medicines to treat certain amoeba infections."  http://www.drugs.com/doxycycline.html (last visited 9/21/09).  Side effects include signs of an allergic reaction, including hives, difficulty breathing, and  swelling of the face, lips tongue or throat. *Id*.  Other serious side effects include severe headache, dizziness, blurred vision; fever, chills, body aches, flu symptoms; severe blistering, peeling and red skin rash; urinating less than usual or not at all; pale or yellowed skin, dark colored urine, confusion or weakness; severe pain in the upper stomach spreading to the back, nausea and vomiting, and fast heart rate; loss of appetite, jaundice of the eyes; and easy bruising or bleeding.  *Id*.

[15]Solu-Medrol is a brand name of methylprednisolone, which "is in a class of drugs called steroids.  Methylprednisolone prevents the release of substances in the body that cause inflammation. Methylprednisolone is used to treat many different conditions such as allergic disorders, skin conditions, ulcerative colitis, arthritis, lupus, psoriasis, or breathing disorders." http://www.drugs.com/mtm/solu-medrol.html (last visited 9/21/09).  Side effects include allergic reactions including hives, difficulty breathing, and swelling of the face, lips, tongue or throat.  *Id*.  Other serious side effects include problems with vision; swelling, rapid weight gain and feeling short of breath; severe depression, unusual thoughts or behavior, and seizures (convulsions); bloody or tarry stools, and coughing up blood; pancreatitis (severe pain in the upper stomach spreading to the back, nausea, and fast heart rate); low potassium (confusion, uneven heart rate, extreme thirst, increased urination, leg discomfort, muscle weakness or a limp feeling); and dangerously high blood pressure (severe headache, blurred vision, buzzing in the ears, anxiety, confusion, chest pain, shortness of breath, uneven heartbeats, or seizure).  *Id*.

treatments.  (R. at 495.)  Plaintiff's condition improved and she was discharged on February 2, 2006.  (*Id*.)

### Dr. Marc Maslov

On January 7, 2004, Marc D. Maslov, M.D., noted that audiometric testing indicated a moderate, low frequency sensorineural loss in the left ear.  (R. at 457.)   MRI images revealed that internal auditory canals were normal, however, sinusitis was worse in the left maxillary, ethmoid and frontal regions.  (R. at 459.)  On January 14, 2004, Dr. Maslov examined plaintiff and noted that she had bilateral eustachian tube dysfunction; she, however, had no middle ear effusion.  (R. at 456.)  Visual testing for vertigo was performed and the results were normal.  (*Id*.)  Dr. Maslov examined plaintiff on March 17, 2004. (R. at 453.)  Plaintiff complained about headaches and intermittent spinning vertigo accompanied by left hearing loss, tinnitus[16] and left ear pressure.  (*Id*.)  Dr. Maslov diagnosed plaintiff with headaches, probably cervical in origin and probable left Ménière's disease.  (*Id*.)

### Dr. Douglas Chen

Plaintiff was seen on March 17, 2005, by Douglas A. Chen, M.D., due to dizziness and left-sided hearing loss. (R. at 229.)  Plaintiff complained of daily spells of a drunken sensation and spinning and tinnitus in her left ear.  (*Id*.)  Plaintiff's otologic and neurotologic examinations were normal but audiometric tests revealed a left low frequency sensorineural loss.  (*Id*.)  Dr. Chen diagnosed plaintiff with left Ménière's disease with intermittent dizziness, left sensorineural hearing

---

[16]"Tinnitus (TIN-i-tus) is noise or ringing in the ears. A common problem, tinnitus affects about one in five people. But, it isn't a condition itself — it's is a symptom of an underlying condition, such as age-related hearing loss, ear injury or a circulatory system disorder." http://www.mayoclinic.com/health/tinnitus/DS00365 (last visited 9/16/09).

loss and tinnitus (*Id.*)   On January 26, 2006, Dr. Chen performed electrocochleography and computerized electronystagmography testing on plaintiff.  (R. at 452.

### Dr. Julie Uran - Psychological Disability Evaluation

On August 24, 2005, plaintiff was given a psychological evaluation by Julie Uran, Ph.D. (R. at 284-91.)  Plaintiff told Dr. Uran she had difficulty securing employment because of fatigue and a general feeling of malaise.  (R. at 284.)  Plaintiff stated that she had moderate and near constant depression including symptoms of lack of appetite and excessive sleeping.  (R. at 285.) Plaintiff denied any current suicidal ideation, but she had a history of one attempt in 1980.  (*Id.*) Plaintiff complained about worsening anxiety that manifests when in public, although she denied being agoraphobic. (*Id.*)  Plaintiff stated that her treatment with Paxil[17] and Xanax are effective and that her emotional status is fair to good. (*Id.*)  Dr. Uran diagnosed plaintiff with recurrent major depression, panic disorder without agoraphobia, alcohol dependence (in remission), and polysubstance dependence (in remission), and assessed plaintiff to have a GAF of 60[18].  (R. at 287.)

---

[17]"Paxil is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRI). It works by restoring the balance of serotonin, a natural substance in the brain, which helps to improve certain mood problems.  Paxil is used to treat depression, obsessive-compulsive disorder, anxiety disorders, post-traumatic stress disorder, and premenstrual dysphoric disorder."   http://www.drugs.com/paxil.html (last visited 9/21/09).  Side effects include allergic reaction (skin rash or hives; difficulty breathing; swelling of the  face, lips, tongue, or throat); mood changes, anxiety, panic attacks, trouble sleeping, irritability, agitation, aggressiveness, severe restlessness, mania (mental and/or physical hyperactivity), thoughts of suicide or hurting oneself.  *Id.*  Other serious side effects include easy bruising or bleeding (such as a nosebleed); very stiff (rigid) muscles, high fever, sweating, fast or uneven heartbeats, tremors, overactive reflexes; nausea, vomiting, diarrhea, loss of appetite, feeling unsteady, loss of coordination; or headache, trouble concentrating, memory problems, weakness, confusion, hallucinations, fainting, seizure, shallow breathing or breathing that stops.  *Id.*

[18]   The GAF scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function. *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-TR)(4th ed. 2000).  A GAF score between 51 and 60 indicates some moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)

Dr. Uran determined that plaintiff's prognosis is fair in terms of higher level functioning and that she is capable of managing her personal funds without assistance. (*Id*.)  Dr. Uran marked that plaintiff would only have slight limitations in her ability to carry out detailed instructions due to her depression and anxiety and that she had no other work-related limitations because of her mental functioning capabilities.  (R. at 290.)

### Dr. Croyle Grant

On September 15, 2005, for reviewing purposes, Croyle Grant, Ph.D. completed a psychiatric review and mental residual functional assessment of plaintiff. (R. at 292-308.)  Plaintiff was assessed as having major depressive disorder, panic disorder without agoraphobia and polysubstance dependence. (R. at 295-300.) Dr. Grant determined that plaintiff had mild limitations in maintaining social functioning and concentration, persistence or pace.  (R. at 302.)  Plaintiff also had moderate limitations in the ability to understand, remember and carry out detailed instructions. (R. at 305.)  Dr. Grant stated that plaintiff had no significant long-term or short-term memory impairment and that she is capable of interacting appropriately with people and adapting to changing activities within the workplace.  (R. at 307.)  Dr. Grant determined that plaintiff would be able to perform the basic mental demands of competitive work on a sustained basis. (*Id*.)

### Dr. Niemiec Michael - Physical Residual Functional Capacity Assessment

On November 2, 2005, Niemiec Michael, D.O., a reviewing physician, filled out a physical residual functional capacity assessment form for the plaintiff. (R. at 309-15.) Plaintiff was assessed to be capable of occasionally lifting and carrying up to twenty pounds and standing, walking or

---

OR moderate difficulty in social, occupational or school functions (e.g., few friends, conflicts with peers or co-workers). *Id.*

sitting for about six hours in an eight- hour workday.  (R. at 310.)  Dr. Michael assessed plaintiff as being able occasionally to climb ramps and stairs, balance, stoop, kneel, crouch and crawl and avoid concentrated exposure to heat, cold, humidity and fumes.  (R. at 311-12.)  Dr. Michael found no communicative limitations, including the ability to hear.  (R. at 312.)  Dr. Michael stated that plaintiff should avoid climbing ladders, ropes and scaffolds secondary to Ménière's disease.  (R. at 314.)

### Testimony from Hearing

#### Plaintiff's Testimony

Plaintiff testified that she has had hepatitis C since she was seventeen years old and that she had episodes of emphysema and pneumonia, a back injury and hearing loss and dizziness from Ménière's disease. (R. at 629-32.)  Plaintiff stated that she had depression and a history of drug and alcohol abuse before she became a mother. (R. at 632.)  Plaintiff stated that Dr. Cunningham's 2005 assessment that plaintiff was limited to lifting no more than ten pounds, stand or walk for no more and one hour and sit less than six still accurately described her condition.  (R. at 633-34.)  Plaintiff stated that if she lifts more than ten pounds or moves too quickly her back will go out and she will become short of breath.  (*Id.*)  Plaintiff stated she had hearing loss, but she agreed that she was able to understand and hear the ALJ at the hearing.  (R. at 635.)   Plaintiff testified that she would experience vertigo or dizziness about once every week or two, but her medication seems to help.  (R. at 635-36.)   Plaintiff is able to drive, although she sometimes has to pull over when she experiences vertigo.  (R. at 636.)  Plaintiff stated that the vertigo symptoms typically last three to five days and that ringing in her left ear was constant. (R. at 639-40.)  Plaintiff stated that the hepatitis C causes her to have chronic fatigue and some pain on her side and back.  (R. at 638.)  Plaintiff

stated that her emphysema caused her to be short of breath and prevented her from doing any strenuous activity.  (R. at 641**.**)  Plaintiff uses an Albuterol[19] inhaler ten to fifteen times a day and uses a nebulizer inhaler two to three times a day.  (R. at 642.)  Plaintiff testified that her limitations frustrate her and she gets depressed and has anxiety attacks when she is in a crowd, although it does not happen often.  (R. at 643.)  Plaintiff stated she has low back and neck pain and headaches.  (R. at 644.)

### The VE's Testimony

The VE testified that someone with hepatitis C, dysphasia, fatigue, Ménière's disease, emphysema, asthma, back and neck pain, headaches and recurrent depression would not be able to perform plaintiff's past work.  (R. at 647-48.)  The VE stated that a person limited to a sedentary exertion level who had the limitations noted previously would be able to perform the positions of account clerk and call operator.  (R. at 651-51.)  When asked if unscheduled breaks from depression or fatigue were added to the hypothetical, the VE stated the person would not be able to perform the account clerk or call operator position.  (R. at 653.)  The VE opined that an employer would not be able to accommodate a new hire calling off work for a week due to emergency room and hospital stays.  (R. at 654.)

---

[19] "Albuterol is a bronchodilator that relaxes muscles in the airways and increases air flow to the lungs.  Albuterol is used to treat or prevent bronchospasm in people with reversible obstructive airway disease. Albuterol is also used to prevent exercise-induced bronchospasm."
http://www.drugs.com/albuterol.html (last visited 9/21/2009).  Side effects include allergic reaction (hives; difficulty breathing; swelling of the face, lips, tongue, or throat).  *Id.*  Other serious side effects include bronchospasm (wheezing, chest tightness, trouble breathing), chest pain and fast, pounding, or uneven heart beats; tremor, nervousness; low potassium (confusion, uneven heart rate, extreme thirst, increased urination, leg discomfort, muscle weakness or limp feeling); or dangerously high blood pressure (severe headache, blurred vision, buzzing in your ears, anxiety, confusion, chest pain, shortness of breath, uneven heartbeats, seizure).  *Id.*

14

### *Legal Standard*

This court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The court may not undertake a *de novo* review of the Commissioner's decision or reweigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). Congress has expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . " 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

### *Discussion*

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A).  Similarly, a person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c (a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied.  20 C.F.R. §§ 404.1520, 416.920.  The evaluation consists of the following phases: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents her from performing her past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of her age, education, work experience, and residual functional capacity.  20 C.F.R. §§ 404.1520, 416.920; *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000).  If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled.  *Burns v. Barnhart*, 312 F.3d 113, 119 (3d Cir. 2002).  The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process.  *Id.*

In the instant case, the ALJ found with respect to the sequential evaluation that (1) plaintiff had not engaged in substantial gainful activity since March 23, 2005; (2) plaintiff suffers from hepatitis C, dysphagia, dizziness and hearing loss due to Ménière's disease, chronic obstructive pulmonary disease, depression and anxiety, which are severe impairments; (3) plaintiff's impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff can not return to any past relevant work; and  (5) since plaintiff has the RFC to perform sedentary work activity where she is limited to not carrying or lifting more than ten pounds, standing and walking for one hour, sitting for six hours and not required to crouch, climb

16

or perform food handling jobs and not requiring more than minimal exposure to fumes, odors, dusts, gases, chemicals, or extremes of temperature or humidity, there were jobs in the national economy that plaintiff could perform.  (R. at 19.)

Plaintiff raises two main issues:

1.   Whether the ALJ failed to consider plaintiff's Ménière's disease under the relevant listing.
2.   Whether the ALJ erred in excluding any reference to plaintiff's mental impairment in determining plaintiff's residual functional capacity.

Each of these issues will be addressed.

**I.    Whether the ALJ failed to consider plaintiff's Ménière's disease under the relevant Listing.**

Plaintiff argues that the ALJ failed to consider properly and discuss whether plaintiff's Ménière's disease satisfies the requirements of Listing 2.07 and that the record indicates that plaintiff does meet that listing.  Listing 2.07 provides:

> 2.07 Disturbance of labyrinthine-vestibular function (including Ménière's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:
>
> > A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
> >
> > B. Hearing loss established by audiometry.

20 C.F.R. pt. 404, subpt. P, app. 1.

An administrative law judge's decision must set forth adequate reasoning in order for "meaningful judicial review." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000).  A bare conclusory statement that an impairment does not meet the listing is insufficient. *Jones v. Barnhart*, 364 F.3d 501, 504 (3d Cir. 2004)(citing *Burnett*, 220 F.3d at 119-20).  An

administrative law judge, however, is not required to "use particular language or adhere to a particular format in conducting his analysis." *Jones*, 364 F.3d at 505. All that is required to permit meaningful judicial review is that "the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [the plaintiff] did not meet the requirements for any listing." *Id*. Thus, the failure to discuss specific listings is not reversible error, so long as the administrative law judge analyzed all the probative evidence and explained the decision sufficiently to permit meaningful judicial review.

Here, the ALJ did not mention Listing 2.07 in the decision. The only reference the ALJ made to a listing was:

> The claimant has a history of hepatitis C (which is currently under control), dysphagia, dizziness and hearing loss due to Meniere's disease, chronic obstructive pulmonary disease, depression, and anxiety, which are "severe" as that term is defined in the Regulations. Though severe, they do not meet or medically equal the requirements of any impairment listed in 20 CFR Part 404, Appendix 1 to Subpart P.

(R. at 17.) Plaintiff acknowledges that the ALJ's discussed her Ménière's disease and argues that the ALJ provided no analysis of the listing requirements relating to plaintiff's Ménière's disease and that overwhelming evidence indicates that plaintiff meets the Listing 2.07. With respect to plaintiff's Ménière's disease, the ALJ noted that the medical evidence included that:

> [c]laimant was referred by Dr. Cunningham to Dr. Chen, a specialist in otology/neurotology, for evaluation on March 17, 2005. She related dizziness and left-sided hearing loss that had persisted for approximately one year. Rotary chair testing showed some central findings and audiometric testing revealed left low frequency sensorineural loss, but otologic and neurotologic examination was normal. Diagnostic impression was left Meniere's disease with intermittent dizziness, left sensorineural hearing loss, and tinnitus, and Dr. Chen indicated that the conditions can be managed medically.

18

(R. at 16.)

The ALJ, however, did not explain why this evidence and other evidence of record did not meet the requirements of Listing 2.07. Although the ALJ considered the effects plaintiff's Ménière's disease had on plaintiff when he included limitations from plaintiff's Ménière's disease in her RFC, stating "[a]s claimant may experience occasional dizziness due to Ménière's disease, she is unable to perform jobs that involve crouching or climbing," (R. at 18), the ALJ did not explain why this evidence, or other evidence in the record, did not meet the listing.

In reviewing the decision as a whole, the court is not able to conduct a meaningful judicial review about the ALJ's step-three determination. The ALJ did not discuss why the evidence and other evidence in the record related to plaintiff's Ménière's disease was rejected as insufficient to meet Listing 2.07. Because the ALJ did not explain his finding that plaintiff did not meet a listing, i.e., Listing 2.07, the court is unable to find that substantial evidence of record supports the ALJ's determination at step three of the sequential evaluation. A remand will be necessary for the ALJ to reassess the evidence of record and explain why plaintiff's impairments do not meet or medically equal the requirements of a listing.

**II.    *Whether the ALJ erred in excluding any reference to plaintiff's mental impairment in determining plaintiff's RFC.***

Plaintiff's second argument is that the ALJ failed to include any limitations that resulted from plaintiff's mental impairment in her RFC. The ALJ's RFC determination was that plaintiff:

> retains the residual functional capacity to frequently lift and carry 10 pounds, stand and walk for hour (each) in an 8-hour period, and sit for 6 hours in an 8-hour period. She is unable to crouch, climb, or perform jobs that involve handling food or require more than minimal

19

> exposure to fumes, odors, dusts, gases, chemicals or extremes of
> temperature or humidity.

(R. at 19.)  Plaintiff argues that it is error as a matter of law for the ALJ not to include mental

limitations in the RFC finding when plaintiff's depression was found to be a "severe" impairment

at step two of the sequential evaluation.

The United States Court of Appeals for the Third Circuit has stated a claimant's RFC and

the hypothetical question relied upon by the ALJ "must reflect *all* of a claimant's impairments."

*Burns,* 312 F.3d at 123 (emphasis in opinionl) (quoting *Chrupcala v. Heckler,* 829 F.2d 1269, 1276

(3d Cir. 1987)).  "Where there exists in the record medically *undisputed evidence* of specific

impairments not included in a hypothetical question" or RFC, the decision by the administrative law

judge is not considered to be supported by substantial evidence. *Id*. (citations omitted)(emphasis

added).

In discussing plaintiff's mental impairments, the ALJ stated:

> [Plaintiff's] [d]iagnosis was recurrent major depression, panic
> disorder without agoraphobia, and alcohol/polysubstance dependence
> in remission.  Noting that claimant's "primary problems" involve
> physical health, Dr. Uran indicated that, apart from slight limitation
> in ability to carry out detailed instructions, claimant has no significant
> restrictions in mental capacity for vocational adjustment.

(R. at 16.)  The ALJ discussed the assessments of Dr. Uran and Dr. Grant, which indicated that

plaintiff would be able to perform the basic mental demands of competitive work on a sustained

basis.   (R. at 307.)   The ALJ, however, did not adequately discuss why plaintiff's mental

impairments did not present work-related limitations.   The VE testified that:

> [T]here are many very effective workers that have been diagnosed
> with mood disturbances and capable, very capable of sustaining
> gainful work activities, but of course, at some point, a mood disorder

20

can become so severe that it does render the person incapable of working.

(R. at 648.)  Because the ALJ's RFC finding contained no reference to mental health work-related limitations, and  the ALJ did not explain why plaintiff's  mental limitations did not affect her ability to work, the court is unable to conduct a meaningful review of the ALJ's finding that  plaintiff had no significant mental health limitations.  Upon remand the ALJ should discuss why plaintiff's mental impairments and limitations do or do not present work-related limitations.

### Conclusion

After consideration of the cross-motions for summary judgment and the record as a whole, the court finds that the ALJ did not adequately explain certain findings in the decision and that the case needs to be remanded.  Plaintiff's and Commissioner's motions for summary judgment will be DENIED.  The decision of the ALJ will be remanded for proceedings consistent with this opinion.


By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge


Dated:          September 22,  2009

21